| | | |
|---|---|---|
| BETH ANN SWEET, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-01950-TWP-MJD |
| | ) | |
| TOWN OF BAGERSVILLE, and | ) | |
| STEVE LONGSTREET, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants Town of Bargersville (the "Town") and Steve Longstreet ("Longstreet") (collectively, "Defendants") ([Filing No. 42](#)).  Plaintiff Beth Ann Sweet ("Sweet") filed this lawsuit after she was terminated from her job at the Town's Clerk-Treasurer's Office.  Sweet asserts claims for age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"), and First Amendment retaliation.  The Defendants contend that Sweet cannot support with evidence an ADEA claim or a First Amendment retaliation claim.  For the following reasons, the Court **grants** the Defendants' Motion.

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Sweet as the non-moving party.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Bargersville, Indiana is a town south of Indianapolis in Johnson County, Indiana.  Defendant Steve Longstreet ("Longstreet") was elected the Clerk-Treasurer of the Town in 2012

([Filing No. 42-7 at 3](#)).  Longstreet retired from the Clerk-Treasurer position in July 2018 ([Filing No. 42-9 at 1](#)).

Plaintiff Sweet worked for the Town in the Clerk-Treasurer's Office from September 25, 1999 until January 26, 2018, when her employment was terminated.  She began her employment there as a receptionist.  Beginning in 2004, Sweet worked in the customer service division, initially focusing on collections work.  She collected past-due utility bills, set up payment plans for the Town's utility customers, disconnected utilities for past-due customers, and otherwise communicated with customers about their utilities.  Sweet would appear in small claims court by herself to pursue the Clerk-Treasurer's collection efforts.  In 2015, the Town outsourced its collections work due to a significant cost savings, so Sweet's job responsibilities shifted to working as a customer service representative ("CSR") where she managed disconnects, set up new accounts, communicated with customers, and managed payments on customers' current accounts ([Filing No. 42-1 at 5](#)–6; [Filing No. 44-2 at 1](#); [Filing No. 42-9 at 1](#)–2).

During her employment with the Town, Sweet consistently received positive job performance reviews up until her review in 2015 when she was no longer doing collections work for the Clerk-Treasurer's Office.  However, there were some years that Sweet was not given a performance review, such as the years 2012 through 2014 and 2017 ([Filing No. 44-2 at 2](#); [Filing No. 44-3](#)).

Longstreet observed that from the time Sweet was moved out of collections, she had difficulty performing the duties required of a CSR.  On February 6, 2015, Sweet was written up for personal use of cell phones and computers during work hours.  Then on April 16, 2015, she was written up for inappropriate conduct and an unprofessional attitude ([Filing No. 42-9 at 2](#), 10–11).  Sweet's performance issues were noted and the issues on which she was expected to show

improvement were noted on her performance reviews for calendar years 2015 and 2016, which were conducted with and signed by Sweet on February 3, 2016 and February 14, 2017. *Id.* at 2, 12–15.

Sweet's 2015 performance review noted that she understood the collections process but was still learning the remaining duties of the CSR position. The 2015 review also indicated that Sweet was argumentative, resistant to change, highly emotional, prone to mistakes due to working too quickly, unorganized, and resistant to delegation and work-sharing. The 2015 review gave Sweet an overall performance rating of 2.6/5.0 and goals of developing a customer life cycle plan from new application to disconnection/termination and cross-training into the billing module. *Id.* at 12–13.

Sweet's 2016 performance review reported that she still had difficulty changing processes and job assignments, still made mistakes due to working too quickly, and could not be counted on for emotional stability though she had made some improvements with this. The review indicated that Sweet made only limited attempts to initiate improvements and had not completely shared her knowledge of disconnection processes with the other team members. It indicated that Sweet continued to be angry about the outsourcing of collections and her transfer to the CSR role, which occurred over a year and a half prior to the evaluation. Her overall performance rating was 2.0/5.0 and the reviewer relisted the 2015 goals as well as added new goals, including completing Incode 10 (a new billing system program) standard operating procedures by July 2017. The review also noted Sweet needed to develop and document a plan for improvement of all rating tasks of two or below. *Id.* at 14–15.

Melissa Fraser ("Fraser") was hired to work in the Clerk-Treasurer's Office in July 2016. She was the direct supervisor for Sweet and the other CSRs. Fraser kept a journal while she was

the supervisor. Fraser did not record everything that occurred in the office in the journal, but she did record things she thought were important. Her journal kept track of both positive and negative things that the CSRs did in performing their job duties (Filing No. 42-11 at 3, 5).

For example, in September and October 2016, Fraser memorialized her approval on a specific day for Sweet to work on personal matters at her work desk during break time and to stay late on another day for end-of-day processes. *Id.* at 18. Fraser recorded some instances when Sweet went above and beyond to provide great customer service to customers and to help coworkers. *Id.* at 19, 21. Fraser also recorded instances of needing to correct all of the CSRs on various office duties and expectations. *Id.* at 18. Instances of the CSRs providing good customer service as well as instances of not performing job duties while on the clock were recorded in Fraser's journal. *Id.* at 18–24.

A July 31, 2017 journal entry noted that Sweet was having "a lot of personal calls lately." *Id.* at 24. Journal entries from mid- to late 2017 indicated problems with Sweet using the work computer for personal shopping and online browsing, making many personal phone calls, and continuing to make mistakes in her work because of working too fast and not paying attention to details (Filing No. 44-4 at 3–4). Fraser's December 12, 2017 journal entry noted, "Beth [Sweet] – Phones ringing and she is on a personal call or talking to someone on Skype. This happens daily and she has been told several times." *Id.* at 4. This problem persisted into January 2018. *Id.* at 6.

In spring 2017, the Town transitioned its billing systems from a program called Incode 9 to Incode 10, which further computerized the disconnection process and reduced the amount of paper used by the Town. The company that owned the Incode 10 system provided training sessions for the software on-site at the Town. While the training was not mandatory for CSRs, each CSR was given the opportunity to train and was expected to take the initiative to obtain any necessary

training.  Fraser also provided individual training to each CSR (Filing No. 42-7 at 12; Filing No. 42-11 at 9; Filing No. 42-10 at 7, 12).  Sweet struggled with comprehension and use of many technological systems, resulting in Sweet personally requesting assistance from the Town's technology coordinator, Kevin Killinger, nearly three times per week and causing Longstreet, Fraser, and others to request assistance from the technology coordinator on her behalf.  It appeared to Killinger, Longstreet and Nancy Kehl ("Kehl") (the chief deputy Clerk-Treasurer) that Sweet showed a lack of initiative to learn the new processes, which led to continued struggles with the Incode 10 system (Filing No. 42-10 at 11, 13; Filing No. 42-11 at 9–10; Filing No. 42-5 at 5).

Fraser's journal entries suggest that transition to Incode 10 and training on the new system began around March 2017 and continued for several months.  A July 2017 journal entry indicated that all of the CSRs had been upset for a few months about the new Incode 10 system, they had complained a lot about the system, and they were not doing anything to learn the new system (Filing No. 42-11 at 20, 24).

In 2016, Longstreet began an initiative to cross-train each of the CSRs in the specialties of the others in an effort to eliminate situations where a CSR might be out of the office because of illness or injury and was the only person capable of performing certain tasks within her specialty.  Longstreet had difficulty getting Sweet to cross-train anyone in the processes in which she specialized or to document her processes so as to assist the other CSRs in attempting to learn them (Filing No. 42-7 at 6; Filing No. 42-5 at 5; Filing No. 42-11 at 9).

In early 2016, The Town implemented new time clock standards for employees.  The Clerk-Treasurer's Office began closely monitoring overtime in response to overtime issues that had arisen with the office staff.  These issues were discussed with Sweet.  After the new time clock standards were put into place, Sweet continued to clock in early many days but did not begin

working at her computer until ten to twenty minutes after she had logged in at the time clock. A video camera was installed near the time clock to monitor these issues, and video footage from the camera revealed that, after clocking in, Sweet would spend ten to twenty minutes or more in the breakroom or restroom prior to logging in to her computer to begin work. Because the time clock for the Clerk-Treasurer's Office automatically tracked time and paid the employees for the time they were logged in on the time clock, Sweet's actions resulted in overtime payments for time that she was not actually working. The clock-in issues were brought to Sweet's attention ([Filing No. 42-12 at 1](#)–2; [Filing No. 42-1 at 11](#)). Sweet would clock in early to open the office, turn on the machinery, open the drop box, and put out the drawers. She does not recall ever being confronted by anyone about specifically not doing work after clocking in ([Filing No. 42-1 at 11](#)–12).

During the summer of 2017, the chief deputy of the Clerk-Treasurer's Office received reports from an employee that Sweet was bullying her. Approximately four or five times throughout the summer, the employee came in tears to the chief deputy and reported that Sweet had accused her of receiving her job as a favor from a Town council member ([Filing No. 42-5 at 8](#)–9). Sweet denies ever bullying her coworkers at the Clerk-Treasurer's Office, and one of her coworkers confirmed that she never observed Sweet bullying or acting inappropriately toward other employees. No one ever discussed the bullying issue with Sweet prior to her termination ([Filing No. 42-5 at 9](#); [Filing No. 44-2 at 3](#); [Filing No. 44-8 at 2](#)).

While he was Clerk-Treasurer, Longstreet had a private business owning and managing rental properties ([Filing No. 42-7 at 3](#)). He also was a partner in a land development project with Jim Parsetich ("Parsetich") of Parsetich Builders. *Id.* at 11. In August 2017, in her position as a CSR, Sweet disconnected Parsetich's utilities because of an unpaid bill ([Filing No. 42-2 at 1](#)–2; [Filing No. 42-7 at 11](#)). Parsetich immediately paid the outstanding bill for the property and all

the associated late fees and signed up for auto-draft for future payments. Upon learning that Parsetich's utilities had been disconnected, Longstreet went against his own policy of no after-hours reconnections to immediately turn the utilities back on for Parsetich (Filing No. 42-2 at 1; Filing No. 42-7 at 11; Filing No. 42-8 at 2–5).

Longstreet met with Sweet the following day and told her she had to be more careful about who she disconnected from utilities and she could not treat a multi-million dollar person the same way as a poor person. Sweet responded to Longstreet saying that the rules had to be the same for everyone. After this incident occurred, Sweet no longer worked on disconnections as a CSR (Filing No. 42-2 at 1). Upon being questioned on the issue, Longstreet explained to office staff that customers should be contacted before a disconnection and due to various issues with the transition to Incode 10, it was preferable to reconnect Parsetich in light of his clear ability to pay the outstanding bill and to remain current in the future than to leave the property disconnected overnight (Filing No. 42-7 at 11–12; Filing No. 42-8 at 2).

Shortly before this incident with Parsetich's disconnection in August 2017, Sweet protested Longstreet's practice of having his private tenants drop off their rent checks at the front desk of the Clerk-Treasurer's Office. Sweet told Longstreet's tenants that she did not work for him outside of the Clerk-Treasurer's Office and that she was not collecting his rent checks at the front desk. Sweet complained to the office manager about the rent collection issue, and thereafter, the office manager sent an email to Longstreet around July 7, 2017, indicating that she did not think it was a good idea to accept rent checks at the Clerk-Treasurer's Office. The office manager also sent an email to inform the other employees in the Clerk-Treasurer's Office that they would no longer be accepting Longstreet's tenants' rent payments (Filing No. 42-2 at 2; Filing No. 42-9 at 7).

Sweet's employment with the Town was terminated on January 26, 2018. She was 53 years old at the time of her termination. Longstreet was the decisionmaker who determined Sweet's employment would be terminated. On the date of her termination, Sweet was asked to attend a meeting with Longstreet, chief deputy Kehl, and office manager, Jane Brockes. Longstreet told Sweet she was being terminated because her job was becoming more automated so there was overall less work for her to do and there was a mismatch between her skillset and the job's requirements. (Filing No. 42-1 at 31.) Sweet was offered a severance package that she could review and consider (Filing No. 42-1 at 31; Filing No. 42-9 at 6; Filing No. 42-7 at 13; Filing No. 42-8 at 13–14).

At the time of her termination, Sweet was 53 years old. The position vacated by Sweet upon her termination was filled by a 51 year old woman, Stephanie Baker ("Baker"), who had previously worked for the Town in a different position. The position vacated by Baker was filled by Becky Thompson ("Thompson"), a newly hired employee who was approximately 41 years old at the time. (Filing No. 42-11 at 3; Filing No. 42-7 at 10; Filing No. 42-5 at 7; Filing No. 42-8 at 1).

On March 23, 2018, Sweet filed a "Charge of Discrimination" with the U.S. Equal Employment Opportunity Commission ("EEOC") (Filing No. 42-13 at 1). On March 29, 2018, the EEOC issued its "Dismissal and Notice of Rights" to Sweet (Filing No. 42-14 at 1). Then on June 26, 2018, Sweet filed her Complaint against the Defendants in this Court (Filing No. 1). About a year after this lawsuit began, the Defendants filed the instant Motion for Summary Judgment.

## II.     SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Sweet as the non-moving party and draws all reasonable inferences in her favor. *Bright v. CCA*, 2013 U.S. Dist. LEXIS 162264, at *8 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9 (citation and quotation marks omitted).

### III. DISCUSSION

The Defendants assert they are entitled to summary judgment on Sweet's ADEA claim because the evidence and law do not support such claims arising from Sweet's termination. They argue Sweet cannot support a *prima facie* case of ADEA discrimination because she was not performing her job satisfactorily, and she was replaced by someone only two years her junior. Additionally, they assert that the Town's reason for Sweet's termination—her poor employment performance—was nondiscriminatory and was not pretextual. The Defendants also argue Sweet cannot support a *prima facie* case of First Amendment retaliation because her speech concerned employment issues and was not constitutionally protected, and there is no causal link between her communications and her termination. In addition, the Defendants argue entitlement to qualified immunity. The Court will first address the age discrimination claim before turning to the retaliation claim.

### A. Age Discrimination Claim

Under the ADEA, an employer is prohibited from engaging in discrimination due to an employee's age. *Wilson v. Blue Sky Casino*, 2017 WL 6729946 at *3 (S.D. Ind. December 29, 2017). Sweet contends her ADEA claim is supported by designated evidence sufficient to be presented to a jury. She acknowledges that she has the initial burden to produce *prima facie*

evidence of being a member of a protected class, being qualified for the job from which she was terminated, she was terminated despite being qualified, and after her termination the position was filled by a person outside the protected class who was not more qualified for the position. *Id.*[1]

Sweet asserts that she can establish a *prima facie* case for age discrimination under the *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), standard. Specifically, she asserts 1) she is a member of the protected class; 2) she was qualified for the job from which she was terminated; 3) despite her qualifications, she was terminated; and 4) after her termination, the position was filled by a person outside the protected class who was not more qualified for the position. *Id*. at 802. Sweet focuses her argument on evidence that she satisfactorily performed her job responsibilities, so she can meet that element of an ADEA claim. However, because this claim can be resolved based on the fourth element—whether younger, situated-similarly employees were treated more favorably, *see Horwitz v. Bd. of Educ.*, 260 F.3d 602, 610 (7th Cir. 2001), or the plaintiff's duties were absorbed by a younger employee who was retained, *see Filar v. Bd. of Educ.*, 526 F.3d 1054, 1060 (7th Cir. 2008)—the Court will focus its discussion and analysis on that element.

Sweet argues that the Defendants' reliance on the fact that she was replaced by Baker (who is two years younger than Sweet) is disingenuous because, even though Baker assumed Sweet's job responsibilities, forty-one year old Thompson (who is twelve years younger than Sweet), was hired immediately after Sweet was fired and assumed Baker's job responsibilities. Sweet argues that the focus should be on whether the employer sought someone to perform the same work after the employee was terminated, pointing to *Allen v. Fort Wayne Foundry Corp.*, 614 F.Supp.2d 943, 953 (N.D. Ind. May 6, 2009). Sweet then argues that in this case, an employee unquestionably took over Sweet's job duties after she was terminated—that employee was Baker—and then an

---

[1] The Defendants do not dispute that Sweet is a member of a protected class, since she was more than 40 years old at the time of termination, and they do not dispute that she was terminated.

employee took Sweet's position (*i.e.*, her salary) immediately after her termination—that employee was Thompson. As such, Sweet asserts, she can satisfy the fourth element of an ADEA *prima facie* claim.

Sweet further argues that her ADEA discrimination claim also survives summary judgment under the standard articulated in *Ortiz v. Werner Enters., Inc.*, where courts consider all the evidence and simply ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." 834 F.3d 760, 765 (7th Cir. 2016). She argues the evidence as a whole shows that the Defendants gave shifting explanations for her termination. Further, she asserts that, in the latter part of 2017, former Town councilman Jim Beck ("Beck") stated to an individual that he was going to "clean out all the old bunch" who had been working for the Town (Filing No. 44-7). While the Defendants assert that Longstreet was the decisionmaker with respect to employment decisions in the Clerk-Treasurer's Office, Sweet refutes this assertion relying on Longstreet's deposition testimony where he stated that the Town Council had authority to tell him whether to eliminate a position in the office (Filing No. 42-7 at 9–10). Sweet argues that, given the longstanding relationship between Beck and Longstreet (they were neighbors for thirty years (*see* Filing No. 42-7 at 3)), as well as the authority that Beck had in his position on the Town Council over the Clerk-Treasurer, it is telling that this statement was made by Beck at the end of 2017, not too far before Sweet's termination.

Sweet asserts this remark is significant when coupled with the other evidence of age discrimination such as the firing practices of the Clerk-Treasurer's Office based on its employment information between January 1, 2013, and September 25, 2018. During that time, out of sixteen employees, eight employees have been terminated, seven of them since 2016. Out of the seven

employees who have been terminated since 2016, one was 41, three were 50 or older, and two were 60 or older. Thus, roughly one-third of the office's workforce, all of whom were over the age of 50, has been terminated since 2013 ([Filing No. 42-7 at 8](); [Filing No. 42-8 at 1]()).

Concerning the fourth element of an ADEA *prima facie* claim, the Defendants explain that "[t]he Supreme Court has clarified that an ADEA plaintiff who shows that he was replaced by someone substantially younger need not prove that the replacement is outside the protected class." *Horwitz*, 260 F.3d at 610. The Defendants argue that Sweet cannot demonstrate she was replaced by a substantially younger employee. Sweet was 53 years old at the time of her termination, and the position vacated by Sweet upon her termination was filled by Baker, who had previously worked for the Town in a different position and was only two years younger than Sweet. Sweet is required to show she was replaced by someone substantially younger than her or she fails to meet her burden of establishing a *prima facie* case of age discrimination. The Defendants assert Sweet has failed to do so.

Regarding the fourth element of a *prima facie* ADEA claim and Sweet's reliance on *Allen v. Fort Wayne Foundry Corp.*, the Defendants explain:

> Plaintiff asserts that despite the fact that Baker, who was two years younger than Plaintiff at the time of Plaintiff's termination, assumed all of her job responsibilities, she was really replaced by Becky Thompson, who took over for Baker when she shifted roles. The limited authority Plaintiff asserts does not support this proposition. Indeed, the great weight of authority supports the conclusion that the term "replaced" as used in the *McDonnell Douglas* line of cases refers to the employee who assumed the terminated employee's responsibilities. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000) ("the inference of discrimination arises in single-discharge cases, sometimes called "mini-RIFs," where the terminated employee's duties are absorbed by other employees not in the protected class."); *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 690, n. 1 (7th Cir. 2006)(Showing under prong 4 of the *McDonnell Douglas* test is satisfied "when a plaintiff demonstrates that the duties of the terminated worker have been absorbed by retained workers outside of the protected class."); *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir. 2000) ("because the fired employee's duties are absorbed by other workers and the employee was replaced,

13

not eliminated, we only require that a plaintiff demonstrate that his duties were absorbed by employees who were not members of the protected class."). As Plaintiff points out, "an employee unquestionably took over Ms. Sweet's job duties after she was terminated. That employee was Baker." Response, p. 23.

(Filing No. 46 at 11.)

The Defendants argue that Councilman Beck was not the decisionmaker for Sweet's termination, and his stray remark to an unrelated individual about "cleaning out all the old bunch" cannot give rise to an inference of age discrimination by Longstreet to terminate Sweet, even if Longstreet and Beck were longtime neighbors. Longstreet testified that, as it relates to Sweet, no member of the Town Council played any role in the employment decisions he made as the Clerk-Treasurer, and no member of the Town Council ever communicated directly or indirectly to him that they wanted to influence his employment decisions (Filing No. 42-9 at 6–7). No evidence has been designated to dispute Longstreet's testimony.

Furthermore, the hiring and employment practices of the Clerk-Treasurer's Office from 2013 through 2018 show there was no age discrimination. During that time period, the Town hired twenty-one employees aged 40 or older. At the time of hiring, six employees were hired by Longstreet. Only one employee hired in the Clerk-Treasurer's Office from 2013 through 2018 was under the age of 40, and that person was 39. During that same time period, the Town terminated or accepted the resignation of thirteen employees aged 40 or older, including Sweet and Longstreet (Filing No. 42-22; Filing No. 42-23; Filing No. 42-24). Thus, the Defendants argue, the Town hired more "older" employees than it terminated, and it replaced Sweet with an employee only two years her junior. The Defendants assert that a reasonable factfinder could not look at this evidence and conclude that Sweet's age caused the discharge; rather, the evidence shows she was discharged because of poor work performance.

A careful review of the designated evidence, the parties' arguments, and the case law lead the Court to conclude that Sweet's age discrimination claim cannot survive summary judgment. To support her claim, Sweet must designate evidence that she was replaced by a substantially younger employee or her duties were absorbed by a substantially younger employee who was retained by the employer. *See Horwitz*, 260 F.3d at 610; *Filar*, 526 F.3d at 1060. Under either consideration, the analysis points back to Baker who was only two years younger than Sweet.[2] Sweet was replaced by Baker. Sweet's job duties were absorbed by Baker. Sweet argued that the focus should be on whether the employer sought someone to perform the same work after the employee was terminated: the Town did seek someone to perform the same work, and that individual was Baker. The case law directs that the focus is on which employee absorbed the job duties of the terminated employee, not who absorbed any salary as Sweet argues to support her position that the proper comparator is Becky Thompson. Because Baker is not substantially younger than Sweet, Sweet cannot support a *prima facie* claim for age discrimination.

When considering the evidence as a whole and determining if a reasonable factfinder could conclude that Sweet's age caused the discharge (as directed by *Ortiz*), the Court is not convinced that a reasonable factfinder could find age discrimination. Six of the seven employees hired by Longstreet (who was the decisionmaker in this case) were older than 40, and the one "younger" employee was 39 when hired. The Town hired twenty-one employees aged 40 or older at the time of hiring from 2013 through 2018. During that period, the Town terminated or accepted the resignation of thirteen employees aged 40 or older, including Sweet and Longstreet. The evidence shows that the Town hired more "older" employees than it terminated. It is no surprise that roughly

---

[2] The Seventh Circuit has noted that there is no bright line drawn for what is "substantially younger," but a ten-year age difference is presumptively substantial. *Richter v. Hook-SupeRx*, 142 F.3d 1024, 1028–29 (7th Cir. 1998) (court determined in that case that a seven-year age difference between employees was not substantial).

one-third of the Clerk-Treasurer's Office workforce that has been terminated since 2013 has been employees over the age of 50 because a vast majority of the employees in the office have been "older" employees. Furthermore, the Town replaced Sweet with an 51 year old employee, only two years her junior.

Regarding the remark from Councilman Beck about "cleaning out all the old bunch," this comment was made to someone other than Longstreet, and Longstreet was the sole decisionmaker in this case. There is no evidence that Longstreet heard Beck's remark or made employment decisions based on this remark. Quite the opposite, the evidence indicates that no member of the Town Council played any role in Longstreet's employment decisions for Sweet, and no member of the Town Council communicated directly or indirectly to him that they wanted to influence his employment decisions concerning Sweet. That Longstreet and Beck were longtime neighbors and the Town Council had some authority to eliminate Town positions requires an inference too attenuated and based in speculation to support Sweet's argument that her firing was based on or influenced by Beck's alleged age animus. This is especially true in light of Longstreet's direct testimony that he was the sole decisionmaker, and he was not influenced by the Town Council.

The designated evidence does not support Sweet's age discrimination claim, and therefore, the Defendants are entitled to summary judgment on that claim.

**B.**   **First Amendment Retaliation Claim**

Sweet next argues that her First Amendment retaliation claim is supported by designated evidence and should survive summary judgment. To establish a *prima facie* First Amendment retaliation claim, she must demonstrate that (1) her speech was constitutionally protected; and (2) her speech was a substantial or motivating factor for her termination. *Kodrea v. City of Kokomo*, 458 F. Supp. 2d 857, 866 (S.D. Ind. June 22, 2006).

Sweet contends that she made three statements outside of her official duties at the Clerk-Treasurer's Office that are entitled to First Amendment protection:

> 1. In or around August 2017, [] Longstreet went against the CTO's policy regarding after hours turn-ons for a business venture partner, Parsetich, who failed to timely pay his utility bills. Ms. Sweet disconnected the utilities and was reprimanded for her actions, which were in compliance with CTO policy. Mr. Longstreet reprimanded Ms. Sweet for disconnecting Parsetich's utilities by saying that she could not treat a multi-million dollar businessman like Parsetich the same as you would someone that is poor. (See Section I, B., 2., *supra*);
>
> 2. In or around June 2017, Ms. Sweet spoke out against Longstreet using the CTO as a place for his personal tenants to pay their rent. Ms. Sweet made a complaint to her supervisor, Jane Brockes, about the inappropriateness of the Clerk Treasurer using the CTO as a collection base for his personal rent payments. Jane Brockes relayed this complaint to Longstreet. (See Section I, B., 2., *supra*); and
>
> 3. Much earlier in Longstreet's tenure as the Clerk Treasurer, Ms. Sweet spoke out against him hiring his son, which was clearly against the Town and office policy. (See Section I, B., 2., *supra*).

(Filing No. 44 at 29–30.)

Sweet argues that her criticism of Longstreet's handling of these issues was outside her ordinary employment role and in her interest as a private citizen on matters of public concern. "Speech is a matter of public concern if it relates to any matter of political, social, or other concern to the community." *Garzarkiewicz v. The Town of Kingsford Heights, Ind.*, 359 F.3d 933, 940–41 (7th Cir. 2004). Sweet notes that speech is not a matter of public concern if the speech involved a personal grievance that is of interest to the employee only. *Id.* at 941. She argues that whether a city is run efficiently, effectively, and with integrity is a matter of public concern, and thus, her speech clearly was a matter of public concern. Sweet further argues that it is of no consequence that her statements were not made to the general public or to the press; her speech was still protected even though the statements were made internally at the Clerk-Treasurer's Office. *See Spiegla v. Hull*, 371 F.3d 928, 937–38 (7th Cir. 2004).

Sweet acknowledges that there must be a causal link between the protected speech and the adverse employment action taken. She asserts that, even though she was not terminated immediately after she spoke out against Longstreet's favoritism for Parsetich, she still suffered an immediate adverse employment action right after her protected speech. She was removed from doing disconnections immediately after she told Longstreet that he could not treat utility customers differently based on their socioeconomic status. Sweet also asserts the Defendants imply that the decision to fire her was not made until January 26, 2018, the day of her termination, but the evidence indicates that the decision to terminate her was made in November 2017, which is only three months after the incident occurred (Filing No. 42-8 at 22). She argues this is enough to show a causal link between her speech and the adverse employment action taken against her.

The Defendants argue that whether Sweet's speech was on a matter of public concern is not a proper inquiry until it first has been determined that she was speaking as a private citizen rather than pursuant to her duties as a public employee. *See Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 510–11 (7th Cir. 2007) ("However, *Garcetti* requires that before analyzing whether an employee's speech is of public concern, a court must determine whether the employee was speaking "as a citizen" or, by contrast, pursuant to his duties as a public employee. 126 S. Ct. at 1960. We therefore engage in the balancing of public and private interests under *Pickering* and its progeny "[o]nly when government penalizes speech that a plaintiff utters 'as a citizen.'").

The Defendants point out that at the time of the disconnection of the Parsetich property, Sweet's job responsibilities included interacting with customers regarding their utility services and disconnecting past-due customers. Longstreet had tried to reduce disconnections by ensuring that communications were regularly sent to customers prior to disconnection. Thus, the communication with utility customers prior to disconnection to determine whether disconnection was necessary

was a part of Sweet's job responsibilities. Therefore, Sweet's discussion with Longstreet regarding the disconnection was directly related to her job duties and was not made as a public citizen. Thus, whether Sweet's speech may have been on a matter of public concern is irrelevant because she failed to first establish that she was speaking outside the performance of her job duties.

The Defendants further argue,

> In order to maintain an[] action for retaliation based upon the exercise of free speech, Plaintiff must demonstrate a causal link between the alleged speech and the adverse action of which Plaintiff complains. The adverse action about which Plaintiff complains in this matter is the termination of her employment (Dkt. 1, Complaint, ¶ 50), not any alleged removal from doing disconnects. While it is true that a First Amendment retaliation claim asserted under § 1983 can be based on a broader swath of actions than a traditional discrimination action [see *Spiegla v. Hull*, 371 F.3d 928, 941, 2004 WL 1301857 (7th Cir. 2004), disapproved in later appeal on other grounds, 481 F.3d 961, 2007 WL 937081 (7th Cir. 2007)], the causal link must, nonetheless, be attached to the specifically challenged action. "This [C]ourt has stated that, in order to carry his or her [motivating factor] burden, the plaintiff must show 'had it not been for the violation, **the injury of which [s]he complains** would not have occurred . . . ." *Spiegla v. Hull*, 371 F.3d at 941 (emphasis added). The injury of which Plaintiff complains is termination (Dkt. 1, Complaint, ¶ 50), not being removed from disconnects.

([Filing No. 46 at 16](#).) (Emphasis in original.)

The Defendants argue that Sweet's termination is the adverse employment action that forms the basis of her retaliation claim, not the decision to terminate (which could have changed at any time up until her termination). Defendants persuasively argue that even if the causal link factor should be measured by the decision to terminate her, which occurred three months after the alleged speech, there is still no causal link. Defendants cite to *Galdikas v. Fagan*, 342 F.3d 684. (7th Cir. 2003). In *Galdikas*, the plaintiffs asserted their protected speech was made on December 15, 2000, the defendants met in executive session (and discussed preventing plaintiffs from protesting) on January 12, 2001 and the adverse action occurred on January 27, 2001. *Id*. at 697. The Seventh Circuit held, where a plaintiff relies on a temporal or chronological connection to

support her claim that there was a causal link between the adverse action and the protected speech, a time period of approximately six weeks between the speech and the adverse action (coupled with specific facts of the case) is insufficient to demonstrate a causal link for purposes of a retaliation claim. *Id*. The Defendants argue the decision to terminate Sweet, made three months after her alleged protected speech, cannot establish a causal link to support a First Amendment retaliation claim.

The Court assumes without actually deciding for purposes of this Motion for Summary Judgment that Sweet's statements were made as a private citizen and involved matters of public concern. Even with that assumption, the Defendants are entitled to summary judgment on the First Amendment retaliation claim because Sweet fails to establish a causal link between her speech and the adverse employment action of which she complains. In her Complaint, Sweet alleges that she "was terminated from her employment by the elected Clerk Treasurer, Steve Longstreet, for speaking out as a private citizen on matters of public concern, in violation of her First Amendment rights." ([Filing No. 1 at 8](.).) Her retaliation claim is not based on being removed from disconnection work. Her claim is based on her termination, which occurred in January 2018. The evidence shows the decision to terminate Sweet was made in late November or early December 2017 ([Filing No. 42-8 at 22](.)). Sweet's last statement was made in August 2017, three months prior to the decision to terminate her and five months prior to her termination. The designated evidence does not support that Sweet was terminated because of age discrimination, rather it supports that she was terminated for non-discriminatory reasons. Considering the Seventh Circuit's decision in *Galdikas* and the facts of this case, the Court determines that such a gap in time is too large to support an inference of retaliation in this case. Accordingly, Sweet's First Amendment retaliation claim fails for lack of a causal connection between the speech and the adverse employment action.

## IV.    CONCLUSION

For the reasons discussed above, Defendants the Town of Bargersville's and Steve Longstreet's Motion for Summary Judgment (Filing No. 42) is **GRANTED**, and Plaintiff Beth Ann Sweet's claims are **dismissed**.  The trial and final pretrial conference are hereby **vacated**. Final judgment will issue under separate order.

**SO ORDERED.**

Date:  4/9/2020

_____

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Mackenzie Elizabeth Skalski
PAGANELLI LAW GROUP
Mackenzie@paganelligroup.com

Jonathan A. Bont
PAGANELLI LAW GROUP
jon@paganelligroup.com

Fred Anthony Paganelli
PAGANELLI LAW GROUP
tony@tonypaganelli.com

Daniel J. Paul
WILLIAMS HEWITT BARRETT & WILKOWSKI LLP
dpaul@wbwlawyers.com

William W. Barrett
WILLIAMS HEWITT BARRETT & WILKOWSKI LLP
wbarrett@wbwlawyers.com